*Michelle L. Conover v. Brittany D. Conover*, No. 79, September Term, 2015, Opinion by Adkins, J.

**FAMILY LAW — VISITATION AND CUSTODY — DE FACTO PARENT:** *De facto* parents have standing to contest custody or visitation and need not show parental unfitness or exceptional circumstances before a trial court can apply a best interests of the child analysis. The Court's previous decision in *Janice M. v. Margaret K.*, 404 Md. 661 (2008), is overruled.

Circuit Court for Washington County
Case No.: 21-C-13-046273 DA
Argued: April 5, 2016

IN THE COURT OF APPEALS

OF MARYLAND

No. 79

September Term, 2015

MICHELLE L. CONOVER

v.

BRITTANY D. CONOVER

Barbera, C.J.
*Battaglia
Greene
Adkins
McDonald
Watts
Raker, Irma S. (Retired,
   Specially Assigned),

JJ.

Opinion by Adkins, J.
Battaglia, Greene and Watts, JJ., concur

Filed: July 7, 2016

* Battaglia, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, she also participated in the decision and adoption of the opinion.

Child custody and visitation decisions are among the most serious and complex decisions a court must make, with grave implications for all parties. The dissolution of a non-traditional marriage just compounds the difficulties of this already challenging inquiry. This appeal arises out of a divorce between a lesbian couple, and involves a dispute over one spouse's right of access to a child conceived by artificial insemination and born before the couple was married. Petitioner calls upon us to revisit the concept of *de facto* parenthood and our previous decision in *Janice M. v. Margaret K.*, 404 Md. 661 (2008).

## FACTS AND LEGAL PROCEEDINGS

Michelle[1] and Brittany Conover began a relationship in July 2002. The parties discussed having a child and agreed that Brittany would be artificially inseminated from an anonymous donor arranged through the Shady Grove Fertility Clinic. The child was conceived in 2009. The couple gave birth to a son, Jaxon William Lee Eckel Conover ("Jaxon"), in April 2010. The birth certificate listed Brittany as Jaxon's mother, but no one was identified as the father. The parties married in the District of Columbia in September 2010 when Jaxon was about six months old.

In September 2011, Michelle and Brittany separated. From the date of separation until July 2012, Michelle visited Jaxon and had overnight and weekend access. At some point in July 2012, Brittany prevented Michelle from continuing to visit Jaxon. In February

---

[1] In her brief, Michelle notes that she is now a "transgender man" and states that the record does not reflect her gender identity because she transitioned to living as a man after the contested divorce hearing occurred. She further explained that she would refer to herself using female pronouns and her former name for consistency with the record and that her gender identity is not material to any legal issue in this appeal. For consistency with the record, we too shall refer to Michelle using female pronouns and her former name.

2013, Brittany filed a Complaint for Absolute Divorce, stating that there were no children shared by the couple from the marriage. Michelle filed an Answer later that month in which she requested visitation rights with respect to Jaxon. In March 2013, Michelle filed a Counter-Complaint for Absolute Divorce, in which she repeated her request for visitation rights. Michelle did not request custody.

In April 2013, the parties appeared at a hearing in the Circuit Court for Washington County to determine Michelle's standing to seek access to Jaxon. Brittany, appearing *pro se*, argued that Michelle did not have parental standing because she was not listed on the birth certificate as a parent of Jaxon, and that as a third party, she could not assert visitation rights. Michelle asserted that she had standing because she met the paternity factors for a "father" set forth in Md. Code (1974, 2011 Repl. Vol.), Estates & Trusts ("ET"), § 1-208(b).[2] At the hearing, Michelle's counsel averred that there were "constitutional

---

[2] Md. Code (1974, 2011 Repl. Vol.), Estates & Trusts Article ("ET"), § 1-208(b) provides:

> A child born to parents who have not participated in a marriage ceremony with each other shall be considered to be the child of his **father** only if the **father**:
> (1) Has been judicially determined to be the father in an action brought under the statutes relating to paternity proceedings;
> (2) Has acknowledged himself, in writing, to be the father;
> (3) Has openly and notoriously recognized the child to be his child; or
> (4) Has subsequently married the mother and has acknowledged himself, orally or in writing, to be the father.

(Emphasis added.) ET § 1-208(a) states that "[a] child born to parents who have not participated in a marriage ceremony with each other shall be considered to be the child of his mother."

reasons" that supported this interpretation, but provided no further explanation. The Circuit Court requested supplemental memoranda. Michelle filed a legal memorandum in which no constitutional contentions were made. Brittany did not submit a memorandum.

The Circuit Court then conducted an evidentiary hearing and took testimony from Michelle and Brittany. The following pieces of evidence were elicited at the hearing:

- Michelle helped choose an anonymous sperm donor with characteristics similar to her own;

- Brittany took on the more "female" role in the relationship, while Michelle took on the more "masculine" role;

- Although Brittany later objected to the practice, Jaxon, at times, called Michelle "Dada" or "Daddy";

- Brittany sometimes referred to Michelle as Jaxon's father;

- A document, dated July 16, 2010, written entirely in Brittany's handwriting was introduced. It stated that both parties "verified" that they agreed to "joint custody" of Jaxon with "[t]he exact terms of which to be determined at a later date";[3]

- Michelle testified that the parties considered initiating a proceeding for Michelle to adopt Jaxon, but they could not afford the cost.

At the conclusion of the evidentiary portion of the proceeding, Michelle's counsel contended that parental standing existed under ET § 1-208(b). She also argued that Brittany was estopped to deny that Michelle was the child's father. Finally, she stated:

---

[3] Michelle testified that the purpose of the document was to facilitate decision-making for Jaxon if Brittany were hospitalized. Brittany testified that she signed the document under duress.

An alternative argument is that my client has standing for custody based on extra . . . extraordinary circumstances. And . . . and I'm not sure if you want me to go into that argument or not. Ah, but for a custody proceeding, a Court can consider custody to a third party or visitation to a third party if the Court finds that there are extraordinary circumstances. And I believe that this case screams extraordinary circumstances.

In June 2013, the Circuit Court issued a written opinion concluding that Michelle did not have standing to contest custody or visitation. First, the court found that Michelle did not have parental standing. The court took note of the common law and statutory presumption that a child born during a marriage is presumed to be the child of both spouses, but concluded that the presumption was not applicable here as Jaxon was conceived and born prior to Brittany and Michelle's marriage. The court also found Michelle did not establish parental standing under ET § 1-208(b) because she was not Jaxon's "father." The court explained:

> Although it is certainly a creative argument, the statute is intended for children to claim parentage and rights to property after a parent has deceased, not for the parent to claim the child under it. Moreover, this Court finds that even under its broadest interpretation, the statute's application was intended by the [L]egislature to be applied in instances of child support, not to establish standing for visitation and custody of a child. *See* Md. Code Ann., Fam. Law § 5-1005(a). [Michelle] argues that although not a male, she has sufficiently satisfied three of the four criteria under [ET] § 1-208(b) to qualify as the minor child's father. [Section] 1-208(b) specifically pertains to the parentage of an illegitimate child claiming his or her "father[,]" which [Michelle] in this case is not. During the hearing the parties testified to the fact that [Michelle] is in fact a female, had not adopted the child, and in no way was related to the child, thus not sufficiently establishing that she could be the "father" of the child.

4

Although the Circuit Court stated that Michelle was Jaxon's *de facto* parent, it relied on *Janice M. v. Margaret K.*, 404 Md. 661 (2008) in concluding that *de facto* parent status was not recognized in Maryland.

Next, the court found that Michelle did not have "third party" standing to contest custody or visitation. Relying on *Janice M.*, the court held that Michelle, as a "third party," had to show that Brittany was unfit or that exceptional circumstances existed to overcome the biological mother's constitutionally protected interest in the care and control of her child. Based on the testimony at the hearing, the court found Brittany to be a fit parent and that "[t]here [had] been no showing of exceptional circumstances." The Circuit Court denied Michelle's request for custody or visitation based on lack of standing.

After the divorce was granted, Michelle timely appealed the Circuit Court's order on visitation to the Court of Special Appeals. The Court of Special Appeals affirmed in a reported decision. *Conover v. Conover*, 224 Md. App. 366 (2015). First, the intermediate appellate court considered it inappropriate to address the issue of whether ET § 1-208(b) must be read to include women. *Id.* at 376. The court noted that whether the Fourteenth Amendment of the United States Constitution or the Equal Rights Amendment of the Maryland Declaration of Rights necessitate that the term "father" in ET § 1-208(b) be given a gender-neutral construction was an issue that was neither raised nor decided below. *Id.* Next, the court ruled that even if Michelle qualified as a "father" under ET § 1-208(b)

5

despite her being female, the statute did not establish parentage for purposes of child custody and visitation:

> A non-biological, non-adoptive spouse who meets one, two or even three tests under ET § 1-208(b) is still a "third party" for child access purposes. Under *Janice M.*, he or she is not a "legal parent" . . . . He or she must still show exceptional circumstances to obtain access to a child over the objection of a fit biological parent and to overcome the natural parent's due process rights.

*Id.* at 380.

We granted Michelle's Petition for Writ of Certiorari presenting the following two questions for review:

> (1) Should Maryland reconsider *Janice M. v. Margaret K.* and recognize the doctrine of *de facto* parenthood?
>
> (2) Did the Court of Special Appeals err in holding that Michelle is a "third party," where Michelle is a legal parent under ET § 1-208(b)?

We hold that *de facto* parenthood is a viable means to establish standing to contest custody or visitation and thus answer yes to the first question. We shall reverse the judgment of the Court of Special Appeals. Because we overturn *Janice M.* and recognize *de facto* parent status, we need not address Michelle's arguments regarding ET § 1-208 and thus do not answer the second question.[4]

---

[4] In her brief, Michelle notes that we must reach the issue of *de facto* parentage even if the Court rules in her favor regarding the statutory parentage presumption under ET § 1-208(b). She explains that should the Court rule in her favor on ET § 1-208(b), it will be possible on remand for the Circuit Court to allow Brittany to rebut her presumptive parentage. Michelle, however, does not argue that we must reach any of the issues pertaining to ET § 1-208(b) should we rule in her favor on *de facto* parenthood.

**STANDARD OF REVIEW**

Brittany and Michelle agree that the facts in this case are not in dispute. Whether we should reconsider *Janice M.* and recognize the doctrine of *de facto* parenthood is a legal question, and so we review the Circuit Court's decision without deference. *Elderkin v. Carroll*, 403 Md. 343, 353 (2008) ("When the ruling of a trial court requires the interpretation and application of Maryland case law, we give no deference to its conclusions of law.").

**DISCUSSION**

The primary goal of access determinations in Maryland is to serve the best interests of the child. *Taylor v. Taylor*, 306 Md. 290, 303 (1986) ("We emphasize that in any child custody case, the paramount concern is the best interest of the child . . . . The best interest of the child is [] not considered as one of many factors, but as the objective to which virtually all other factors speak."); *Ross v. Hoffman*, 280 Md. 172, 174–75 (1977) (asserting that the "best interest standard is firmly entrenched in Maryland and is deemed to be of transcendent importance"). It is also well-established that the rights of parents to direct and govern the care, custody, and control of their children is a fundamental right protected by the Fourteenth Amendment of the United States Constitution. *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923); *see Pierce v. Society of Sisters*, 268 U.S. 510, 534-35 (1925). Although there is some tension inherent amongst these two deep-rooted principles, we

recognized in *McDermott v. Dougherty*, 385 Md. 320, 353 (2005), that the rights of parents to custody of their children are generally superior to those of anyone else:

> Where the dispute is between a fit parent and a private third party, however, both parties do not begin on equal footing in respect to rights to "care, custody, and control" of the children. The parent is asserting a fundamental constitutional right. The third party is not.

We have thus held that a third party seeking custody or visitation must first show unfitness of the natural parents or that extraordinary circumstances exist before a trial court could apply the best interests of the child standard. *McDermott*, 385 Md. at 325; *see Koshko v. Haining*, 398 Md. 404, 445 (2007) (ruling grandparent visitation statute unconstitutional as-applied where no threshold finding was made regarding whether parents were unfit or whether exceptional circumstances existed).

### Janice M. v. Margaret K.

In *Janice M.*, 404 Md. at 671, we considered whether Maryland recognized *de facto* parenthood and if so, whether a *de facto* parent seeking custody or visitation had to show parental unfitness or exceptional circumstances before a trial court could apply the best interests of the child standard. In so holding, we overruled the Court of Special Appeals decision treating *de facto* parental status as sufficient to confer standing to seek visitation in *S.F. v. M.D.*, 132 Md. App. 99 (2000). *Janice M.*, 404 Md. at 683–85. That court held that a *de facto* parent seeking visitation need not prove the unfitness of the biological parents or exceptional circumstances as a prerequisite to a best interests of the child analysis. 132 Md. App. at 111–12.

8

In revisiting this issue, we examine the basis for the intermediate appellate court's ruling in *S.F. v. M.D.*, and this Court's rationale in rejecting that ruling in *Janice M.* To determine whether one is a *de facto* parent, the Court of Special Appeals adopted a four-part test first articulated by the Wisconsin Supreme Court in *In re Custody of H.S.H.-K.*, 533 N.W.2d 419, 421 (Wisc. 1995):

> In determining whether one is a de facto parent, we employ the test enunciated in *In re Custody of H.S.H.-K.*, 193 Wis.2d 649, 533 N.W.2d 419 (1995), and *V.C. v. M.J.B.*, 163 N.J. 200, 748 A.2d 539 (2000). Under that test, "the legal parent must consent to and foster the relationship between the third party and the child; the third party must have lived with the child; the third party must perform parental functions for the child to a significant degree; and most important, a parent-child bond must be forged." *V.C.*, 163 N.J. at 223, 748 A.2d 539.

*Id.* at 111.[5] *Certiorari* was not requested in *S.F. v. M.D.*

But what exactly is *de facto* parenthood? The Court in *Janice M.* explained that the phrase "*de facto* parent" is "used generally to describe a party who claims custody or visitation rights based upon the party's relationship, in fact, with a non-biological, non-adopted child." 404 Md. 680–81.[6] In that case, two women, Janice and Margaret, were

---

[5] In a decision affirming visitation for a biological mother's same-sex former domestic partner, the New Jersey Supreme Court described the four-part test enunciated in *In re Custody of H.S.H.-K.*, 533 N.W.2d 419, 421 (Wisc. 1995) as "[t]he most thoughtful and inclusive definition of *de facto* parenthood." *V.C. v. M.J.B.*, 748 A.2d 539, 551 (N.J. 2000).

[6] The American Law Institute ("ALI") defines a *de facto* parent as:

> [A]n individual other than a legal parent or a parent by estoppel who, for a significant period of time not less than two years,
>
> (i) lived with the child and,

involved in a same-sex relationship for approximately 18 years, but were not married.[7] *Id.*

at 665.  After Janice's attempts to become pregnant by use of *in vitro* fertilization failed,

Janice, but not Margaret, adopted a child.  *Id.*  A few years after the adoption, the couple

separated.  *Id.*  After they separated, Margaret filed a complaint in the Circuit Court for

Baltimore County seeking custody, or in the alternative, visitation.  *Id.* at 666–67.

Relying on *S.F. v. M.D.*, the Circuit Court concluded that Margaret was entitled to

visitation because she was a *de facto* parent and that a *de facto* parent is not required show

unfitness of the biological parent or exceptional circumstances.  *Id.* at 668–69.  The Court

of Special Appeals affirmed.  *See Janice M. v. Margaret K.*, 171 Md. App. 528 (2006).

*Certiorari* was granted, and this Court overruled the intermediate court's eight-year-old

---

(ii) for reasons primarily other than financial compensation, and with the agreement of a legal parent to form a parent-child relationship, or as a result of a complete failure or inability of any legal parent to perform caretaking functions,

(A) regularly performed a majority of the caretaking functions for the child, or

(B) regularly performed a share of caretaking functions at least as great as that of the parent with whom the child primarily lived.

American Law Institute, Principles of the Law of Family Dissolution: Analysis and Recommendations § 2.03(1)(c) (2003) (adopted May 16, 2000).

[7] Same-sex marriages were not authorized under Maryland law at that time.  *See Conaway v. Deane*, 401 Md. 219 (2007).

decision in *S.F.*, holding *de facto* parent status was not a recognized legal status in Maryland. *Janice M.*, 404 Md. at 685. In rejecting the *S.F.* holding, the Court refused to distinguish *de facto* parents from other third parties and asserted that *de facto* parents seeking access rights must first show parental unfitness or exceptional circumstances before a trial court can apply the best interests of the child standard:

> We will not recognize *de facto* parent status, as set forth in *S.F.*, as a legal status in Maryland. We refuse to do so because, even *assuming arguendo* that we were to recognize such a status, short-circuiting the requirement to show unfitness or exceptional circumstances is contrary to Maryland jurisprudence, as articulated in *McDermott* and *Koshko*.
>
> Even were we to recognize some form of *de facto* parenthood, the real question in the case *sub judice* will remain, whether, in a custody or visitation dispute, a third party, non-biological, non-adoptive parent, who satisfies the test necessary to show de facto parenthood should be treated differently from other third parties. We have not been persuaded that they should be. In other words, where visitation or custody is sought over the objection of the parent, before the best interest of the child test comes into play, the *de facto* parent must establish that the legal parent is either unfit or that exceptional circumstances exist. A fair reading of *McDermott* and *Koshko* leads to no other conclusion.

*Id.* Accordingly, the Court found that the trial court erred in granting Margaret visitation based on her status as the child's *de facto* parent without first determining whether Janice was unfit or whether exceptional circumstances existed to overcome Janice's "liberty interest in the care, custody, and control of her child." *Id.* at 695. The Court then remanded the case so that the trial court could determine whether exceptional circumstances existed. *Id.* at 695–96. In doing so, we explained that "a finding that one meets the requirements that would give that person *de facto* parent status, were that status to be recognized, is a

11

strong factor to be considered in assessing whether exceptional circumstances exist[,]" but would not be "determinative as a matter of law." *Id.* at 695.

The Court's decision in *Janice M.* was not unanimous. In a dissenting opinion, Judge Irma Raker asserted "that a *de facto* parent is different from 'third parties' and should be treated as the equivalent of a legal parent, with the same rights and obligations." *Id.* at 696 (Raker, J., dissenting). The dissent contended that it "would hold that a *de facto* parent stands in legal parity with a legal parent, whether biological, adoptive, or otherwise, for the purposes of visitation" and "would not apply the threshold determinations of parental unfitness or exceptional circumstances." *Id.* at 709.

## Stare Decisis

Stare decisis is the bedrock of our legal system because "it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process." *Livesay v. Balt. Cnty.*, 384 Md. 1, 14 (2004) (quoting *Payne v. Tennessee,* 501 U.S. 808, 827 (1991)). Stare decisis, however, must sometimes yield to another judicial duty:

> [The common law] may be changed by legislative act as Art. 5 of the Declaration of Rights expressly provides . . . . It may also be changed by judicial decision . . . . 'We have frequently held that it is our duty to determine the common law as it exists in this State . . . .' The doctrine of *stare decisis* does not preclude the exercise of this duty.

*Boblitz v. Boblitz*, 296 Md. 242, 274 (1983), *modified by Bozman v. Bozman*, 376 Md. 461

(2003).[8]  In the course of abrogating the doctrine of interspousal immunity in tort claims,

the *Boblitz* Court stated:

> We are persuaded that the reasons asserted for its retention do
> not survive careful scrutiny.  They furnish no reasonable basis
> for denial of recovery for tortious personal injury.  We find no
> subsisting public policy that justifies retention of a judicially
> created immunity that would bar recovery for injured victims
> in such cases as the present.

*Id.* at 273.  We further explained in *Boblitz*:

> '[W]e have never construed [the doctrine of *stare decisis* ] to
> inhibit us from changing or modifying a common law rule by
> judicial decision where we find, **in light of changed
> conditions or increased knowledge that the rule has become
> unsound in the circumstances of modern life,** a vestige of
> the past, no longer suitable to our people.'

*Id.* at 274 (quoting *Harrison v. Montgomery Cnty.*, 295 Md. 442, 459 (1983)).[9]  We have

also considered Supreme Court analysis of stare decisis*:*

---

[8] The Court in *Boblitz v. Boblitz*, 296 Md. 242 (1983), abolished spousal immunity
only for negligence actions.  In *Bozman v. Bozman*, 376 Md. 461, 497 (2003), we
modified *Boblitz* by expanding the variety of torts for which one spouse could sue
another: "Joining the many of our sister States that have already done so, we abrogate the
interspousal immunity rule, a vestige of the past, whose time has come and gone, as to all
cases alleging an intentional tort."

[9] *Unger v. State*, 427 Md. 383, 417 (2012) identified various cases in which we
overruled our prior decisions:

> This Court has not hesitated to overrule prior decisions which
> are clearly wrong.  *See, e.g., Cure v. State,* 421 Md. 300, 320–
> 322, 26 A.3d 899, 910–911 (2011) (The Court, in an opinion
> by Judge Harrell, overruled a prior decision of this court
> concerning waiver and adopted the position of the three
> dissenters in that prior case); *Harris v. Board of Education*, 375

The Supreme Court has stated that 'it is common wisdom that the rule of stare decisis is not an 'inexorable command,' and certainly it is not such in every constitutional case.' *Planned Parenthood v. Casey*, 505 U.S. 833, 854, 112 S.Ct. 2791, 2808, 120 L.Ed.2d 674 (1992).

Stare decisis is the preferred course because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process . . . . **Nevertheless, when governing decisions are unworkable or are badly reasoned, this Court has never felt constrained to follow precedent**. Stare decisis is not an inexorable command; rather, it is a principle of policy and not a mechanical formula of adherence to the latest decision. [Citations omitted] [Internal quotation omitted.] *Payne v. Tennessee*, 501 U.S. 808, 827-28, 111 S.Ct. 2597, 2609, 115 L.Ed.2d 720 (1991).

*Bozman*, 376 Md. at 493–94 (quoting *Perry v. State*, 357 Md. 37, 96–100 (1999)) (emphasis added).

In short, we have recognized two circumstances for departing from stare decisis: (1) when the prior decision is "clearly wrong and contrary to established principles" or (2) when "the precedent has been superseded by significant changes in the law or facts." *DRD*

---

Md. 21, 59, 825 A.2d 365, 388 (2003) (Overruling three prior cases and their progeny on the ground that the overruled cases had erroneously inserted in the Workers Compensation Act an additional requirement not included by the Legislature); *State v. Kanaras*, 357 Md. 170, 184, 742 A.2d 508, 516 (1999) (Overrules five prior decisions which had misinterpreted the Postconviction Procedure Act); *Owens–Illinois v. Zenobia*, 325 Md. 420, 470–471, 601 A.2d 633 (1992) (The Court overruled several cases relating to punitive damages on the ground that the "holdings were erroneous and were inconsistent with [prior] Maryland . . . law"); *Townsend v. Beth.–Fair. Shipyard*, 186 Md. 406, 417, 47 A.2d 365, 370 (1946).

*Pool Serv., Inc. v. Freed*, 416 Md. 46, 64 (2010) (citations and internal quotation marks omitted).[10] As explained below, we depart from *Janice M.* on both grounds.

*Grounds for Decision in Janice M.*

The *Janice M.* Court relied heavily on *McDermott* and *Koshko* to support its rejection of *de facto* parenthood and determination that persons meeting this status must nonetheless show parental unfitness or exceptional circumstances before a trial court can apply the best interests of the child standard. *See Janice M.*, 404 Md. at 685–86 ("Clearly, in light of *McDermott* and *Koshko, S.F.* no longer reflects Maryland law, and accordingly, is overruled.").

As Judge Raker pointed out in her dissenting opinion, *McDermott* and *Koshko* "dealt with the rights of pure third parties, and not those of *de facto* parents." *Id.* at 705–06 (Raker, J. dissenting). In *McDermott*, which involved maternal grandparents seeking custody in litigation against the child's father, the Court distinguished "pure third parties" from those persons who are in a parental role. 385 Md. at 356. Specifically, the court differentiated "pure third parties" from psychological parents. *Id.*[11] The Court defined the

---

[10] This ground is also described as "when the precedent has been rendered archaic and inapplicable to modern society through the passage of time and evolving events." *State v. Stachowski*, 440 Md. 504, 520 (2014) (internal citations omitted).

[11] Although the Court used the term "physiological parents," it is clear that this was a typographical error. *McDermott v. Dougherty*, 385 Md. 320, 356 (2005) ("Some states have conceptualized the idea of *physiological* parents, third parties who have, in effect, become parents and thus, the case is considered according to the standards that apply between natural parents.") (emphasis added). In the very same paragraph, the Court used the phrase "psychological parent." *Id.* ("In that situation there are no constitutional rights involved (although in some cases constitutional claims are made using terms such as '*psychological* parent' and the like) and the 'best interest' standard is generally applied.")

15

phrase "psychological parents" as "third parties who have, in effect, become parents." *Id.*

The term "psychological parent" is closely related to the "*de facto* parent" label in that these designations are used to describe persons who have assumed a parental role.[12]

The Court then made clear that *McDermott* was a "pure third-party case" before it proceeded to analyze other pure third-party cases. 385 Md. at 356–57 ("[I]n comparison with the total number of cases in which attempts are made to utilize the 'best interest' standard . . . the number of pure third-party cases*, such as the present case*, is relatively

---

(emphasis added). In addition, in its later discussion of other jurisdictions, the *McDermott* Court also used the phrase "psychological parents." Finally, a Westlaw search for "physiological parents," "physiological parent," and "physiological parenthood" yielded no cases other than *McDermott*.

[12] *Compare Janice M. v. Margaret K.*, 404 Md. 661, 681 n.8 (2008) ("The term 'psychological parent' is based primarily in social science theory, and refers to a party who has a 'parent-like' relationship with a child as a result of 'day-to-day interaction, companionship, and shared experiences.'") (quoting Joseph Goldstein, Anna Freud & Albert J. Solnit, Beyond the Best Interests of the Child 19 (1973)), *with id.* at 680 (stating that "'parent in fact'" is the "literal meaning" of *de facto* parent). These terms are so similar that courts often use them interchangeably. *See, e.g.*, *V.C.*, 748 A.2d at 546 n.3 (noting that "[t]he terms psychological parent, *de facto* parent, and functional parent" would be "used interchangeably in this opinion to reflect their [similar] use in the various cases, statutes, and articles cited"); *see generally In re Parentage of L.B.*, 122 P.3d 161, 167 n.7 (Wash. 2005) (explaining the meaning of "the related yet distinct terms of *in loco parentis*, psychological parent, and *de facto* parent"). As one commentator put it, the psychological parent and *de facto* parent "doctrines are often used interchangeably, and the nuances between them vary by jurisdiction, but the same basic principles underlie their application." Lindsy J. Rohlf, Note, *The Psychological-Parent and* De Facto-*Parent Doctrines: How Should the Uniform Parentage Act Define "Parent"?*, 94 Iowa L. Rev. 691, 700 (2009) (describing the differences between the two doctrines as "superficial"). Indeed, the Court in *Janice M.* acknowledged the similarity of these terms. 404 Md. at 681 n.8 ("While these designations [*de facto* parent, *in loco parentis* and psychological parent] are related, they are not always, or necessarily, identical in meaning.").

small.  It is on these remaining cases throughout the country, that we primarily focus our attention.") (emphasis added).[13]

Likewise, *Koshko* involved grandparents seeking visitation, who did not claim to be *de facto* parents.  The Court in *Koshko* simply extended our holding in *McDermott*—that parental unfitness and exceptional circumstances are threshold considerations in third party custody determinations—to visitation disputes.  398 Md. at 443 ("Now that we conclusively have stated in *McDermott* that parental unfitness and exceptional circumstances shall be threshold considerations in third party custody determinations, it is appropriate that we now also apply those considerations in third party visitation disputes."); *see Janice M.*, 404 Md. at 680 ("*McDermott* made clear that parental unfitness and exceptional circumstances are threshold considerations in third party custody determinations; *Koshko* made clear that those considerations apply in third party visitation disputes.").  But neither *McDermott* nor *Koshko* justified this Court's decision in *Janice M.*  What the Court failed to identify was any rationale for eliminating consideration of the parent-like relationship that the plaintiff sought to protect.  It seemingly ignored the bond that the child develops with a *de facto* parent.

<em>Troxel v. Granville</em>

The *Janice M.* Court relied in part on the United States Supreme Court's decision in *Troxel v. Granville*, 530 U.S. 57 (2000), indicating that it also undermined the

---

[13] The Court also examined cases in which a state was involved in the custody process, but did not consider these to be "pure third-party" cases.  *See McDermott*, 385 Md. at 365 (citing Connecticut Supreme Court decision and observing it was "not a pure third-party case in that the state was the petitioning party").

intermediate appellate court's decision in *S.F. See* 404 Md. at 672–74, 683 ("[T]he Court of Special Appeals has considered the concept, as well as the status, of a *de facto* parent in the context of visitation rights in the case of *S.F.* . . . . It did so, however, prior to the Supreme Court's decision in *Troxel*, and our decisions in *McDermott* and *Koshko*."). In *Troxel,* the U.S. Supreme Court addressed an appeal from a petition to obtain visitation rights filed by the grandparents of two minor children pursuant to a Washington State visitation statute. The Washington statute provided that "[a]ny person may petition the court for visitation rights at any time, including, but not limited to, custody proceedings. The court may order visitation rights for any person when visitation may serve the best interest of the child whether or not there has been any change of circumstances." *Troxel*, 530 U.S. at 61 (citing Wash. Rev. Code § 26.10.160(3) (1994)). In a fractured opinion, a four-justice plurality held the Washington statute unconstitutional as applied to the facts of the case. *Id.* at 73. The high court determined that the state trial court's visitation order in favor of the grandparents was an unconstitutional infringement on the parent's "fundamental right to make decisions concerning the care, custody, and control" of her children under the Fourteenth Amendment's Due Process Clause. *Id.* at 72.

*Troxel* was an extremely narrow decision. *See Hernandez v. Hernandez*, 265 P.3d 495, 498 (Idaho 2011) (describing *Troxel*'s import as "limited" and "stand[ing] for the narrow proposition that Wash. Rev. Code § 26.10.160(3) (1994) is constitutionally infirm as applied in that case"); *see also* Jeff H. Pham, Comment, *Does Mother Still Know Best?: In Re Marriage of Harris and Its Impact on the Rights of Custodial Parents*, 38 Loy. L.A.

L. Rev. 1871, 1878 (2005) (characterizing *Troxel* as a "deliberately narrow opinion").[14] The Court's holding hinged "on the sweeping breadth" of the Washington statute and "the application of that broad, unlimited power." *Troxel*, 530 U.S. at 73.[15] Writing on behalf of the plurality, Justice O'Connor expressly declined to address whether substantive due process requires a showing of harm before non-parental visitation is ordered and asserted that "[w]e do not, and need not, define today the precise scope of the parental due process right in the visitation context." *Id.* Additionally, it bears mention that the Supreme Court did not strike down the Washington statute as unconstitutional on its face, but only as applied. The Court further maintained that it "would be hesitant to hold that specific nonparental visitation statutes violate the Due Process Clause as a *per se* matter." *Id.* (stating that "the constitutionality of any standard for awarding visitation turns on the specific manner in which that standard is applied").

As many courts immediately recognized, *Troxel* did not denote the end of third party visitation. *See, e.g.*, *Jackson v. Tangreen*, 18 P.3d 100, 103–04 (Ariz. Ct. App. 2000) (holding Arizona grandparent visitation statute constitutional and concluding that *Troxel* "has no impact" on the state statute); *Rideout v. Riendeau*, 761 A.2d 291, 303 (Me. 2000) (ruling Maine's Grandparents Visitation Act, as applied, did not violate the Due Process

---

[14] Even the *Koshko* Court acknowledged the narrowness of *Troxel v. Granville*, 530 U.S. 57 (2000). *See Koshko v. Haining*, 398 Md. 404, 443 (2007) ("We are aware that the plurality opinion in *Troxel* does not compel our holding in this regard in the present case.").

[15] *See* Jeff Atkinson, *Shifts in the Law Regarding the Rights of Third Parties to Seek Visitation and Custody of Children*, 47 Fam. L.Q. 1, 4 (2013) ("The Washington state statute under which visitation had been granted in *Troxel* was one of the broadest in the country.").

Clause of the Fourteenth Amendment); *Hertz v. Hertz*, 738 N.Y.S.2d 62, 64–65 (N.Y. App. Div. 2002) (reversing trial court's judgment that New York's grandparent visitation statute was unconstitutional and asserting that "*Troxel* does not mandate a finding that [grandparent visitation statute] is unconstitutional *per se*").

Indeed, several state courts of last resort have expressly held that *Troxel* does not prevent the recognition of *de facto* parent status. For example, in *In re Parentage of L.B.*, the Washington Supreme Court adopted the concept of *de facto* parentage and rejected a biological mother's contention that granting a putative *de facto* parent standing to seek custody of a minor child would infringe on the biological mother's fundamental parental interests under *Troxel*. 122 P.3d 161, 178–79 (Wash. 2005) ("Finding no constitutional infirmities in recognizing *de facto* parents"). Similarly, in upholding the constitutionality of a state statute permitting a *de facto* parent to seek custody, the Delaware Supreme Court explained:

> *Troxel* does not control these facts. The issue here is not whether the Family Court has infringed Smith's fundamental parental right to control who has access to ANS [the minor child] by awarding Guest co-equal parental status. Rather, the issue is whether Guest is a legal "parent" of ANS who would also have parental rights to ANS—rights that are co-equal to Smith's. This is not a case, like *Troxel*, where a third party having no claim to a parent-child relationship (e.g., the child's grandparents) seeks visitation rights. **Guest is not "any third party." Rather, she is a [] *de facto* parent who . . . would also be a legal "parent" of ANS.** Because Guest, as a legal parent, would have a co-equal "fundamental parental interest" in raising ANS, allowing Guest to pursue that interest through a legally-recognized channel cannot unconstitutionally infringe Smith's due process rights. In short, Smith's due process claim fails for lack of a valid premise.

20

*Smith v. Guest*, 16 A.3d 920, 931 (Del. 2011) (involving lesbian couple and dispute over access to Smith's adopted child) (emphasis added) (footnotes omitted).[16]

In her *Janice M.* dissent, Judge Raker rightly emphasized that courts "have continued to recognize the *de facto* parenthood concept post-*Troxel*." 404 Md. at 701–03 (Raker, J., dissenting). Put simply, numerous courts have declined to treat *Troxel* as a bar to recognizing *de facto* parenthood or other designations used to describe third parties who have assumed a parental role. *See, e.g.*, *Bethany v. Jones*, 378 S.W.3d 731, 737 (Ark. 2011) ("We reiterate that the focus should be on what, if any, bond has formed between the child and the nonparent."); *Marquez v. Caudill*, 656 S.E.2d 737, 743 (S.C. 2008) ("Because Stepfather is [child's] psychological parent and is, in fact, the only father he has ever known, we find the family court appropriately determined that it was in [child's] best interest for Stepfather to have custody of him"); *In re Guardianship of Victoria R.*, 201 P.3d 169, 177 (N.M. Ct. App. 2008) ("[W]e hold that a showing that the [] petitioners have assumed the role of the psychological parents of the child who is the subject of the [] proceeding to the extent that the child will suffer a 'significant degree of depression' if the relationship with the psychological parents is abruptly terminated is sufficient to rebut the presumption that the biological parent is acting in the child's best interests"); *Mason v.*

---

[16] In *SooHoo v. Johnson*, 731 N.W.2d 815 (Minn. 2007), the Minnesota Supreme Court upheld a provision of the state's third party visitation statute granting *de facto* parents visitation. In finding the provision not unconstitutional, the court noted that the fundamental right of parents to the care, custody, and control of their children is not absolute and cited the United States Supreme Court's recognition "that states may intrude on parental rights in order to protect the 'general interest in the youth's well being.'" 731 N.W.2d at 822 (citing *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944)).

*Dwinnell*, 660 S.E.2d 60, 65, 70 (N.C. Ct. App. 2008) (concluding that former domestic partner of natural parent had standing to bring an action for custody of child where couple "entered into an agreement in which they each acknowledged that [former partner] was a *de facto* parent and had 'formed a psychological parenting relationship with the parties' child'"); *In re Clifford K.*, 619 S.E.2d 138, 144, 159 (W. Va. 2005) (holding that surviving lesbian partner had standing as a "psychological parent" to seek custody of child she had helped raise with her late partner); *C.E.W. v. D.E.W.*, 845 A.2d 1146, 1150-51 (Me. 2004) (reaffirming that courts may "entertain an award of parental rights and responsibilities to a de facto parent"); *In re E.L.M.C.*, 100 P.3d 546, 554 (Colo. App. 2004) (former partner of lesbian mother was a "psychological parent" with standing to seek custody); *T.B. v. L.R.M.*, 786 A.2d 913, 917–19 (Pa. 2001) (lesbian former partner of a child's biological mother could seek partial custody and visitation based on her standing *in loco parentis* to the child); *Rubano v. DiCenzo*, 759 A.2d 959, 975 (R.I. 2000) ("[A] person who has no biological connection to a child but who has served as a psychological or de facto parent to that child may . . . establish his or her entitlement to parental rights vis-a-vis the child").

Indeed, no case has interpreted *Troxel* as inconsistent with parental status for non-biological parents except Maryland. Treatment by these other courts helps to demonstrate the error made by the *Janice M.* Court in reasoning that *Troxel* undermined *S.F.* and the recognition of *de facto* parenthood.

*The Wisconsin Rule—In re Custody of H.S.H.-K.*

Before *Janice M.*, the intermediate appellate court's recognition of *de facto* status in *S.F.* was consistent with *McDermott*, *Koshko*, and *Troxel* because the test it used to

22

determine *de facto* parenthood was narrowly tailored to avoid infringing upon the parental autonomy of a legal parent. The Court of Special Appeals borrowed a four-factor test enunciated by the Wisconsin Supreme Court in its seminal decision in *H.S.H.-K.*, 533 N.W.2d at 421.[17] Under this test, a third-party seeking *de facto* parent status bears the burden of proving the following when petitioning for access to a minor child:

> (1) that the biological or adoptive parent consented to, and fostered, the petitioner's formation and establishment of a parent-like relationship with the child;
>
> (2) that the petitioner and the child lived together in the same household;
>
> (3) that the petitioner assumed obligations of parenthood by taking significant responsibility for the child's care, education and development, including contributing towards the child's support, without expectation of financial compensation; and
>
> (4) that the petitioner has been in a parental role for a length of time sufficient to have established with the child a bonded, dependent relationship parental in nature.

*H.S.H.-K.*, 533 N.W.2d at 435–36. As other courts adopting this test have recognized, these factors set forth a high bar for establishing *de facto* parent status, which cannot be achieved without knowing participation by the biological parent. *See, e.g., V.C.*, 748 A.2d at 551–53 ("Prong one is critical because it makes the biological or adoptive parent a participant in the creation of the psychological parent's relationship with the child.");

---

[17] The Wisconsin Supreme Court in *In re Custody of H.S.H.-K.*, 533 N.W.2d 419, 421 (Wisc. 1995), "was one of the first states to adopt equity principles to protect a functional parent-child relationship." Danaya C. Wright, *Inheritance Equity: Reforming the Inheritance Penalties Facing Children in Nontraditional Families*, 25 Cornell J.L. & Pub. Pol'y 1, 15 (2015).

*Rubano*, 759 A.2d at 974 ("[These] criteria preclude such potential third-party parents as mere neighbors, caretakers, baby sitters, nannies, au pairs, nonparental relatives, and family friends from satisfying these standards."); *E.L.M.C.*, 100 P.3d at 560 ("These four factors ensure that a nonparent's eligibility for psychological parent treatment with respect to an unrelated child will be strictly limited."). Under this strict test, a concern that recognition of *de facto* parenthood would interfere with the relationship between legal parents and their children is largely eliminated. We thus adopt the multi-part test first articulated by the Wisconsin Supreme Court in *H.S.H.-K.*[18]

The *de facto* parent doctrine does not contravene the principle that legal parents have a fundamental right to direct and govern the care, custody, and control of their children because a legal parent does not have a right to voluntarily cultivate their child's parental-type relationship with a third party and then seek to extinguish it. As the South Carolina Supreme Court explained in *Marquez*, 656 S.E.2d at 744:

> [T]he first factor [in the *H.S.H.-K.* test] is critical because it makes the biological or adoptive parent a participant in the creation of the psychological parent's relationship with the child. This factor recognizes that when a legal parent invites a third party into a child's life, and that invitation alters a child's life by essentially providing him with another parent, the legal parent's rights to unilaterally sever that relationship are necessarily reduced.

---

[18] In deciding whether to award visitation or custody to a *de facto* parent, the equity court should also take into account whether there are other persons who have already been judicially recognized as *de facto* parents. A court should be very cautious and avoid having a child or family to be overburdened or fractured by multiple persons seeking access.

*See also T.B.*, 786 A.2d at 919 ("The Superior Court aptly noted, under similar circumstances, that a biological parent's rights 'do not extend to erasing a relationship between her partner and her child which she voluntarily created and actively fostered simply because after the parties' separation she regretted having done so.'"). The *H.S.H.-K.* standard for determining *de facto* parenthood is therefore consistent with the Supreme Court's reaffirmation in *Troxel*, 530 U.S. at 66, of "the fundamental right of parents to make decisions concerning the care, custody, and control of their children," as well as with *McDermott* and *Koshko*. It is also consistent with an earlier, most pertinent decision by this Court—*Monroe v. Monroe*, 329 Md. 758 (1993).

### *Monroe v. Monroe*

In *Monroe* a putative father sought custody of a child as a third party before learning from blood tests that he was not the biological father of the child. 329 Md. at 760–63. In discussing whether exceptional circumstances existed to rebut the presumption that the child's best interests were served by remaining with her biological mother, we concluded that "[w]hat is important, rather, is the relationship that exists between the child and each of the parties." *Id.* at 775. We further asserted that protection of a child's relationship with a non-biological parent is justified "when the relationship is developed in the context of a family unit and is fostered, facilitated and, for most of the child's life, encouraged by the biological parent." *Id.*; *cf. Marquez*, 656 S.E.2d at 744 ("[T]he first factor [in the *H.S.H.-K.* test] is critical because it makes the biological or adoptive parent a participant in the creation of the psychological parent's relationship with the child.").

25

Although the Court in *Monroe* was evaluating whether exceptional circumstances existed, the reasoning of *Monroe* is equally apposite to *de facto* parenthood. In the words of the *Monroe* Court:

> Whether the child has established a relationship with a third party sufficient to constitute exceptional circumstances, rebutting the presumption of custody in the biological parent, is not dependent on its development during the absence of the biological parent. A relationship resulting in bonding and psychological dependence upon a person without biological connection can develop during an ongoing biological parent/child relationship. Particularly is this true when the relationship is developed in the context of a family unit and is fostered, facilitated and, for most of the child's life, encouraged by the biological parent.

*Monroe*, 329 Md. at 775.

Our previous recognition of the importance—for legal purposes—of a psychological bond between a child and non-parent confirms the notion that *de facto* parenthood is distinct from pure third party status. *Id.*; *see also McDermott*, 385 Md. at 356 (distinguishing "pure third parties" from "psychological parents"). The *Monroe* Court's emphasis on bonding and psychological dependence reflects the longstanding judicial recognition in Maryland (and elsewhere) that children need good relationships with parental figures and they need them to be stable. The *Janice M.* Court's rejection of *de facto* parent as a status sufficient for standing in child access cases contravenes this universally accepted concept. For these reasons, the first ground for overruling *Janice M.* is satisfied—the precedent was "clearly wrong and contrary to established principles." *DRD Pool Serv.*, 416 Md. at 64.

*Janice M. Has Been Undermined By Subsequent Events*

The anemic grounds for the *Janice M.* decision are not the only reason we recognize the doctrine of *de facto* parenthood. Additionally, the passage of time and evolving events have rendered *Janice M.* obsolete—the second circumstance recognized in *DRD Pool Serv.* and other cases. Maryland's recognition of same-sex marriage in 2012—Civil Marriage Protection Act, Ch. 2, 2012 Md. Laws 9—undermines the precedential value of *Janice M.* Our state's recognition of same-sex marriage illustrates the greater acceptance of gays and lesbians in the family unit in society. *See also* Melina Constantine Bell, *Gender Essentialism and American Law: Why and How to Sever the Connection*, 23 Duke J. Gender L. & Pol'y 163, 200 (2016) ("[G]ay men and lesbians, and same-sex couples are gaining greater acceptance in the U.S."); Elizabeth S. Scott & Robert E. Scott, *From Contract to Status: Collaboration and the Evolution of Novel Family Relationships*, 115 Colum. L. Rev. 293, 374 (2015) (reviewing the "dramatic change in public attitudes . . . for same-sex couples who wish to marry").

But gays and lesbians are particularly "ill-served by rigid definitions of parenthood." Nancy D. Polikoff, *This Child Does Have Two Mothers: Redefining Parenthood to Meet the Needs of Children in Lesbian-Mother and Other Nontraditional Families*, 78 Geo. L.J. 459, 464 (1990).[19] As Polikoff explained, when gay or lesbian

---

[19] *See also* Patricia M. Logue, *The Rights of Lesbian and Gay Parents and Their Children*, 18 J. Am. Acad. Matrimonial Law. 95, 115 (2002) ("Many lesbian and gay people are having and parenting children with a partner. If the relationship ends by death or separation, the parent-child relationships of nonbiological de facto parents may be cast into legal limbo.").

relationships end, at least one member "will find itself in a court system ill-prepared to recognize its existence and to formulate rules to resolve its disputes. . . . [t]he contestants stand as a parent and a nonparent, a legal status inconsistent with their functional status." *See id.* at 463. Thus, the General Assembly's according greater rights to same-sex couples when it recognized same-sex marriage in 2012 further undermines the value of adhering to *Janice M.*, a precedent which can be considered "archaic" because it fails to effectively address problems typical of divorce by same-sex married couples. *See State v. Waine*, 444 Md. 692, 700 (2015) ("We may decline to follow the doctrine when persuaded the prior decision is clearly wrong, or when the precedent has been rendered archaic and inapplicable to modern society through the passage of time and evolving events.") (citation and internal quotation marks omitted). The same problems exist even when an unmarried same-sex couple separates.[20]

In addition, a majority of states, either by judicial decision or statute, now recognize *de facto* parent status or a similar concept. *See* Nancy D. Polikoff, *From Third Parties to Parents: The Case of Lesbian Couples and Their Children*, 77 Law & Contemp. Probs. 195, 208 (2014) ("A minority of states . . . have denied a functional psychological parent without legal status the ability to request custody or visitation rights."); *see also* Katharine T. Bartlett, *Prioritizing Past Caretaking in Child-Custody Decisionmaking*, 77 Law & Contemp. Probs. 29, 66 (2014) (observing that most jurisdictions that "have directly

---

[20] Of course, persons ending a heterosexual marriage or other relationship may also achieve standing if they meet the criteria set forth in *H.S.H.-K.*, 533 N.W.2d at 421, which we have adopted herein.

confronted the matter recognize de facto parenthood in certain limited circumstances" and counting Maryland among the few jurisdictions that "appear to remain committed to doctrines denying custodial responsibilities altogether to third parties who have engaged in day-to-day, residential caretaking in a parenting capacity").

Indeed, the Washington Supreme Court identified a "modern common law trend of recognizing the status of *de facto* parents" as early as 2005. *Parentage of L.B.*, 122 P.3d at 176 n.24. A diverse array of jurisdictions, from Alaska to West Virginia, constitute this majority. *See, e.g.*, *Kinnard v. Kinnard*, 43 P.3d 150, 151, 153–55 (Alaska 2002) (affirming shared-custody award to father and stepmother, who was the child's psychological parent); *E.N.O. v. L.M.M.*, 711 N.E.2d 886, 888, 891-93 (Mass. 1999) (adopting *de facto* parenthood and affirming judgment granting temporary visitation to lesbian former partner of biological mother); *Parentage of L.B.*, 122 P.3d at 177 ("[H]enceforth in Washington, a *de facto* parent stands in legal parity with an otherwise legal parent, whether biological, adoptive, or otherwise."); *C.E.W.*, 845 A.2d at 1149 ("We have recognized *de facto* parental rights or similar concepts in addressing rights of third persons who have played an unusual and significant parent-like role in a child's life . . . ."); *T.B.*, 786 A.2d at 917, 920 (rejecting biological mother's argument that "the well-established doctrine of *in loco parentis* should be abandoned" and concluding that "the lower courts properly found that [lesbian former partner] stood *in loco parentis* to [child] and therefore had standing to seek partial custody for purposes of visitation"); *Boseman v. Jarrell*, 704 S.E.2d 494, 504–05 (N.C. 2010) (affirming that non-biological parent could be granted custody rights "because [biological mother] acted inconsistently with her

29

paramount parental status"); *Rubano*, 759 A.2d at 976 ("[T]he fact that [biological mother] not only gave birth to this child but also nurtured him from infancy does not mean that she can arbitrarily terminate [lesbian former partner's] de facto parental relationship with the boy, a relationship that [biological mother] agreed to and fostered for many years."); *V.C.*, 748 A.2d at 550 (concluding former lesbian partner of biological mother had standing to seek joint custody and visitation); *Marquez*, 656 S.E.2d at 745 (stepfather was the psychological parent of his non-biological child and it was in child's best interest for stepfather to have custody of him); *E.L.M.C.*, 100 P.3d at 553–54 (former partner of lesbian mother was a "psychological parent" with standing to seek custody; "inherent in the bond between child and psychological parent is the risk of emotional harm to the child should that relationship be significantly curtailed or terminated"); *Latham v. Schwerdtfeger*, 802 N.W.2d 66, 75 (Neb. 2011) ("The district court erred when it concluded that the doctrine of in loco parentis did not apply to this case. The undisputed facts show that [lesbian former partner] has rights which are entitled to consideration and has standing based on the doctrine of in loco parentis."); *In re Jonathan G.*, 482 S.E.2d 893, 913 (W. Va. 1996) ("[W]e hold that a child has a right to continued association with individuals with whom he has formed a close emotional bond, including foster parents, provided that a determination is made that such continued contact is in the best interests of the child."); *Bethany*, 378 S.W.3d at 738 ("Having determined that Jones [biological mother's former same-sex partner] stood *in loco parentis,* the question then becomes whether it is in [the child's] best interest for Jones to have visitation rights, as that is the polestar

consideration."). In some states, legislation was enacted authorizing standing for a *de facto* parent to sue for either custody or visitation.[21]

Additionally, family law scholarship and the academic literature have also endorsed the notion that a functional relationship—as well as biology or legal status—can be used to define parenthood.

The American Law Institute ("ALI") has recommended expanding the definition of parenthood to include *de facto* parents and includes a *de facto* parent as one of the parties with standing to bring an action for the determination of custody, subject to the best interests of the child analysis. ALI, Principles of the Law of Family Dissolution: Analysis and Recommendations §§ 2.03, 2.04 (2003) (adopted May 16, 2000).[22] Additionally, many

---

[21] *See* D.C. Code § 16-831.03(a) (West, Westlaw through May 11, 2016) ("A de facto parent may file a complaint for custody of a child or a motion to intervene in any existing action involving custody of the child."); Del. Code Ann. tit. 13, § 8-201(c) (West, Westlaw through 80 Laws 2016) ("De facto parent status is established if the Family Court determines that the de facto parent . . . ."); Or. Rev. Stat. Ann. § 109.119 (West, Westlaw through 2016 Reg. Sess.) ("Except as otherwise provided in subsection (9) of this section, any person, including but not limited to a related or nonrelated foster parent, stepparent, grandparent or relative by blood or marriage, who has established emotional ties creating a child-parent relationship or an ongoing personal relationship with a child may petition or file a motion for intervention with the court having jurisdiction over the custody, placement or guardianship of that child . . . ."); Tex. Fam. Code Ann. § 102.003(a)(9) (West, Westlaw through 2015 Reg. Sess.) ("An original suit may be filed at any time by a person, other than a foster parent, who has had actual care, control, and possession of the child for at least six months ending not more than 90 days preceding the date of the filing of the petition.").

[22] Pamela Laufer-Ukeles, *Money, Caregiving, and Kinship: Should Paid Caregivers Be Allowed to Obtain De Facto Parental Status?*, 74 Mo. L. Rev. 25, 29 (2009) ("In the last two decades, a trend has developed in state law and in scholarly commentary toward increasing openness to awarding parenting rights to third parties who have been functional caregivers to children, precipitating the adoption of de facto parenthood and parenthood by estoppel status in the ALI Principles.").

commentators have espoused the concept of *de facto* parenthood in examining the inadequacies of recognizing only legal parenthood. Emily R. Lipps, Note, Janice M. v. Margaret K*.: Eliminating Same-Sex Parents' Rights to Raise Their Children by Eliminating the De Facto Parent Doctrine*, 68 Md. L. Rev. 691 (2009) (criticizing *Janice M.* and arguing that Court should have recognized *de facto* parent status); Sacha M. Coupet, *"Ain't I a Parent?": The Exclusion of Kinship Caregivers from the Debate over Expansions of Parenthood*, 34 N.Y.U. Rev. L. & Soc. Change 595, 653 (2010) ("[D]e facto parental status holds tremendous promise as an avenue for kinship caregivers seeking parental recognition."); Dorothy R. Fait, Jillian L. DiLaura & Michelle M. Botek, *Who Is A Parent?*, 42 Md. B.J. 4, 10 (2009) ("The natural parent should not be permitted to use the 'fundamental right to parent' as a shield once the '*de facto parent*' relationship is no longer convenient. In certain cases, the best interests of the child can only be protected through the legal acceptance of the de facto parent . . . .").

In short, *Janice M.* now deviates sharply from the decisional and statutory law of other jurisdictions. The weight of authority outside Maryland reinforces our decision to overturn *Janice M.* and recognize *de facto* parenthood.

### Maryland Statutory Law

Importantly, Maryland statutory law is silent when it comes to *de facto* parenthood. At oral argument, Brittany maintained that we should not overrule *Janice M.* because *de facto* parent status should be left to the General Assembly. We disagree. The General Assembly has granted equity courts jurisdiction over the "custody or guardianship of a child." Md. Code (1984, 2012 Repl. Vol.), Family Law ("FL") Article §1-201(b)(5). As

32

part of their broad power to fashion appropriate relief, equity courts have "plenary authority to determine questions concerning the welfare of children." *Stancill v. Stancill*, 286 Md. 530, 534 (1979). "In other words, a court of chancery stands as a guardian of all children and may interfere at any time and in any way to protect and advance their welfare and interests." *Ross v. Hoffman*, 280 Md. 172, 176 (1977).

Other jurisdictions in recognizing *de facto* status have also cast aside the contention that recognition of such status should be left to the legislative branch where the relevant statutes were silent on *de facto* parenthood. In *Parentage of L.B.*, 122 P.3d at 176, the Washington Supreme Court wrote:

> Our state's current statutory scheme reflects the unsurprising fact that statutes often fail to contemplate all potential scenarios which may arise in the ever changing and evolving notion of familial relations. Yet, simply because a statute fails to speak to a specific situation should not, and does not in our common law system, operate to preclude the availability of potential redress. This is especially true when the rights and interests of those least able to speak for themselves are concerned. We cannot read the legislature's pronouncements on this subject to preclude any potential redress to [minor child] or [putative *de facto* parent]. In fact, to do so would be antagonistic to the clear legislative intent that permeates this field of law—**to effectuate the best interests of the child in the face of differing notions of family and to provide certain and needed economical and psychological support and nurturing to the children of our state**.

*Id.* (emphasis added). This reasoning is in accord with other state high courts that have recognized *de facto* parenthood. *See, e.g.*, *H.S.H.-K.*, 533 N.W.2d at 424–25 ("Nor did the legislature intend the [] visitation statute to supplant or preempt the courts' long standing equitable power to protect the best interest of a child by ordering visitation in circumstances

not included in the statute. . . . [t]he legislature did not intend to [] 'occupy the field' of visitation."); *E.N.O.*, 711 N.E.2d at 890 ("The court's duty as parens patriae necessitates that its equitable powers extend to protecting the best interests of children in actions before the court, even if the Legislature has not determined what the best interests require in a particular situation.").

Although several state courts have refused to adopt *de facto* parent status on the grounds that such decisions should be left to the legislature,[23] we find this reasoning inapt because Maryland's statutory scheme in the area of family law is not as comprehensive as such states. Indeed, Maryland statutory law on child custody and visitation illustrates that "statutes often fail to contemplate all potential scenarios which may arise in the ever changing and evolving notion of familial relations." *Parentage of L.B.*, 122 P.3d at 176.

Maryland does not have statutory factors for courts to consider in determining whether a party's access to a child is in that child's best interests. *See* FL §§ 9-101–9-108; *see also* Linda D. Elrod & Robert G. Spector, *A Review of the Year in Family Law 2011–2012: "DOMA" Challenges Hit Federal Courts and Abduction Cases Increase*, 46 Fam. L.Q. 471, 524–27 (2013) (indicating that Maryland is only one of eleven states not to have

---

[23] *See, e.g.*, *Smith v. Gordon*, 968 A.2d 1 (Del. 2009); *Jones v. Barlow*, 154 P.3d 808 (Utah 2007); *Moreau v. Sylvester*, 95 A.3d 416 (Vt. 2014). For instance, before Delaware's General Assembly recognized *de facto* parenthood by statute, Del. Code Ann. tit. 13, § 8-201(c), the Delaware Supreme Court refused to adopt *de facto* parent status because the state legislature "enact[ed] a comprehensive statutory scheme that reflect[ed] a public policy unambiguously to define the parent-child relationship as a legal relationship." *Smith v. Gordon*, 968 A.2d at 15.

statutory factors).[24]   Rather than looking to codified rules, the factors courts consider in making a "best interests determination" are found in case law.  *Taylor v. Taylor*, 306 Md. 290, 303–312 (1986).  This judicially determined law has been in place for many years, without legislation overruling it.  *See Montgomery Cnty. v. Robinson*, 435 Md. 62, 78 (2013) ("It is a settled principle of Maryland law that the General Assembly is presumed to be aware of legislation it has enacted as well as the interpretation the courts have given that legislation.") (internal citations omitted).  Thus, we discern no evidence that Maryland's General Assembly intended to preempt common law jurisprudence over the "ever changing and evolving notion of familial relations" in child custody proceedings.

For these reasons, we reject Brittany's contention that an equity court's ability to consider *de facto* parent status in fashioning relief pertaining to the custody or guardianship of a child lies solely within the province of the General Assembly.[25]

## Conclusion

We overrule *Janice M.* because it is "clearly wrong" and has been undermined by the passage of time.  In light of our differentiation in *McDermott*, 385 Md. at 356, between "pure third parties" and those persons who are in a parental role, we now make explicit that

---

[24] It should be noted that the General Assembly has provided some legislative direction in custody proceedings.  Under Md. Code (1984, 2012 Repl. Vol.), Fam. Law Article § 9-101, a court must determine if it has "reasonable grounds to believe" that a child has been abused or neglected by a party seeking custody and if so, the court must make a finding that there is no further likelihood of abuse or neglect if unsupervised custody or access is to be awarded to that person.

[25] The General Assembly has the power, of course, to enact a differing standard than the one we now restore.

*de facto* parents are distinct from other third parties. We hold that *de facto* parents have standing to contest custody or visitation and need not show parental unfitness or exceptional circumstances before a trial court can apply a best interests of the child analysis. The best interests of the child standard has been "firmly entrenched in Maryland and is deemed to be of transcendent importance." *Ross*, 280 Md. at 174–75. With this holding we fortify the best interests standard by allowing judicial consideration of the benefits a child gains when there is consistency in the child's close, nurturing relationships.

We do so carefully, adopting the multi-part test first articulated by the Wisconsin Supreme Court in *H.S.H.-K.* This test accommodates, we think, the dissonance between what is in the best interest of a child and a parent's right to direct and govern the care, custody, and control of their children.

We reverse the Court of Special Appeals, and direct that court to remand this case to the Circuit Court for determination of whether, applying the *H.S.H.-K.* standards, Michelle should be considered a *de facto* parent, and conduct further proceedings consistent with this opinion.

> **JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REMAND THE CASE TO THE CIRCUIT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY RESPONDENT.**

Circuit Court for Washington County
Case No. 21-C-13-046273
Argued: April 5, 2016

IN THE COURT OF APPEALS

OF MARYLAND

No. 79

September Term, 2015

_____

MICHELLE L. CONOVER

v.

BRITTANY D. CONOVER

_____

Barbera, C.J.
*Battaglia
Greene
Adkins
McDonald
Watts
Raker, Irma S. (Retired, Specially
Assigned)

JJ.

_____

Concurring Opinion by Greene, J.

_____

Filed: July 7, 2016

*Battaglia, J., now retired, participated in the
hearing and conference of this case while an
active member of this Court; after being recalled
pursuant to the Constitution, Article IV, Section
3A, she also participated in the decision and
adoption of the opinion.

I agree with the Majority's conclusion that *de facto* parent status should be recognized in Maryland. In that regard, we are correct to recognize that this status exists, and to overrule *Janice M. v. Margaret K.*, 404 Md. 661, 948 A.2d 73 (2008). In addition, I agree with the test enunciated in *In re Custody of H.S.H.-K.*, 533 N.W.2d 419 (Wisc. 1995) and *V.C. v. M.J.B.*, 748 A.2d 539 (N.J. 2000). Likewise, I agree with the Majority's decision in this case to adopt and apply this test in order to establish *de facto* parentage. I disagree, however, that a person who qualifies as a *de facto* parent is not required, *per se*, to establish exceptional circumstances. Consistent with our case law, the burden was on Michelle Conover to demonstrate exceptional circumstances to justify the need for a best interest analysis. *See Ross v. Hoffman*, 280 Md. 172, 178–79, 372 A.2d 582, 587 (1977). I agree that *de facto* parentage is a relevant factor but it is not the only factor for the court to consider in reaching the ultimate decision to grant child access.

In my view, *de facto* parent status can best be described as a subset of exceptional circumstances. The fact that another person has a psychological bond with the child, a bond that was fostered by the legal parent, is but one relevant factor that would warrant a finding of an exceptional circumstance, and could overcome the presumption in favor of the legal or adoptive parent to control access to the child.

Other probative factors would include:

[(a)] the length of time the child has been away from [either] the biological [and or adoptive] parent, [(b)] the age of the child when care was assumed by the [*de facto* or biological parent], [(c)] the possible emotional effect on the child [resulting from] a change of custody [or visitation], [(d)] [any] period of time which elapsed before the [*de facto* or legal] parent sought to reclaim [access to] the child, [(e)] the nature and strength of the ties between the child and the [*de facto* parent], [(f)] the intensity and genuineness of the

[respective] parent's desire to have the child [for the purposes of visitation or custody], [(g)] the stability and certainty as to the child's future in the custody of [or having access to] the [*de facto*] parent.

*See Ross*, 280 Md. at 191, 372 A.2d at 593.

The existence of a *de facto* parent status, the fact that a child has a close emotional bond with the *de facto* parent and that it would be in the best interest of the child to maintain that bond, are questions for the trial judge to resolve. Thus, the trial court would decide ultimately the existence of exceptional circumstances and whether the *de facto* parent's access to a child is in that child's best interest. *See Taylor v. Taylor*, 306 Md. 290, 307–11, 508 A.2d 964, 972–74 (1986). In its determination of the best interest of the child, the trial judge would be in the best position to consider all of the relevant factors.

For the above reasons, I concur in the judgment of the Court.

Circuit Court for Washington County
Case No. 21-C-13-046273

Argued: April 5, 2016

IN THE COURT OF APPEALS

OF MARYLAND

No. 79

September Term, 2015

_____

MICHELLE L. CONOVER

v.

BRITTANY D. CONOVER

_____

Barbera, C.J.
*Battaglia
Greene
Adkins
McDonald
Watts
Raker, Irma S. (Retired, Specially
Assigned)

JJ.

_____

Concurring Opinion by Watts, J., which
Battaglia, J., joins

_____

Filed: July 7, 2016

*Battaglia, J., now retired, participated in the
hearing and conference of this case while an
active member of this Court; after being recalled
pursuant to the Constitution, Article IV, Section
3A, she also participated in the decision and
adoption of this opinion.

Respectfully, I concur. Although I agree with the Majority in the recognition of *de facto* parenthood in Maryland, in my view, the Majority, in adopting the four-factor test set forth by the Supreme Court of Wisconsin in In re Custody of H.S.H-K., 533 N.W.2d 419 (Wisc. 1995), see Maj. Slip Op. at 22-24, 36, adopts a standard that is too broad and that could have a negative impact on children in Maryland.

By adopting the four-factor test set forth in H.S.H.-K., 533 N.W.2d at 435, the Majority holds that, under the first factor, when seeking *de facto* parent status, the third party must show "that the biological or adoptive parent consented to, and fostered, the [third party]'s formation and establishment of a parent-like relationship with the child[.]" In other words, the Majority holds that only one parent is needed to consent to and foster a parent-like relationship with the would-be *de facto* parent. This will work in cases such as this one, where a second biological or adoptive parent does not exist, *i.e.*, where there is only one existing parent. Where there are two existing parents, however, permitting a single parent to consent to and foster a *de facto* parent relationship could result in a second existing parent having no knowledge that a *de facto* parent, *i.e.*, a third parent, is created. Such situations may result in a child having three parents vying for custody and visitation, and being overburdened by the demands of multiple parents. Today, many children are not living in a classic nuclear family. Families include not only same-sex married parents—in which one parent had a child before marriage—but also separated or divorced parents who conceived children during a marriage, as well as two parents who have never married. The Majority has written broadly a solution for *de facto* parents that will serve couples well under circumstances similar to the parties in this case, where there is only one

biological or adoptive parent. The majority opinion, however, will have greater consequences in cases for children with two existing parents because a *de facto* parent request may occur without the knowledge or consent of the second existing parent. Children who already have difficulty with visitation schedules, or experience custody issues pertaining to two parents, will not be served well by the creation of a test that does not account for the second existing parent's knowledge and consent.

Oddly, the Majority expresses concern that multiple *de facto* parentships not be created and that trial courts should be cautious about overburdening families with multiple people seeking access in that regard. See Maj. Slip Op. at 24 n.18. Ironically, however, the Majority expresses no concern about the creation of a single *de facto* parentship where there are already two existing parents, and where one parent may create a *de facto* parentship absent the other existing parent's notice of, and consent to, the *de facto* parentship of a third party.

Imagining the untenable situation of a child who is parented by two adults one of whom, without the knowledge or consent of the second already existing parent, creates a *de facto* parentship, I cannot agree with simply adopting the four-factor test without additional limits and safeguards. Even creating a standby guardianship in Maryland has traditionally required the consent of both parents. Indeed, under Md. Code Ann., Est. & Trusts (1974, 2011 Repl. Vol.) § 13-903(a), concerning judicial appointment of a standby guardianship, provides, in relevant part:

> (1) Subject to the provisions of paragraph (2) and (3) of this subsection, a petition for the judicial appointment of a standby guardian of the person or property of a minor under this section may be filed only by a parent of the

minor, and if filed, **shall be joined by each person having parental rights over the minor**.

(2) If a person who has parental rights cannot be located after reasonable efforts have been made to locate the person, the parent may file a petition for the judicial appointment of a standby guardian.

(3) If the petitioner submits documentation, satisfactory to the court, of the reasonable efforts to locate the person who has parental rights, the court may issue a decree under this section.

(Emphasis added). By contrast, here, the Majority creates the irreconcilable result that one parent in Maryland may not consent to a standby guardianship, absent documentation that the parent made reasonable efforts to locate and obtain the consent of the other parent, but that one parent may consent to and foster a *de facto* (third) parent for a child without any sort of notice to, or consent from, a second existing parent. In my view, this is not a desirable result.

Further, during the 2010 and 2015 legislative sessions, the General Assembly failed to pass *de facto* parent bills which were similarly or more narrowly constructed than the holding of the majority opinion. In 2010, two bills—Senate Bill 600 and House Bill 1241—were introduced "for the purpose of requiring a court to determine that an individual is a de facto parent under certain circumstances; establishing that an individual who is judicially determined to a be a de facto parent has the duties and obligations of a parent; and generally relating to de facto parents." S.B. 600, 2010 Regular Session, General Assembly of Maryland, http://mgaleg.maryland.gov/2010rs/bills/sb/sb0600f.pdf (capitalization omitted); H.B. 1241, 2010 Regular Session, General Assembly of Maryland, http://mgaleg.maryland.gov/2010rs/bills/hb/hb1241f.pdf (capitalization

- 3 -

omitted).  At that time, the proposed bills would have added a new section to the Family Law Article, providing, in pertinent part, that a court shall determine that an individual is a *de facto* parent if the individual requests a judicial determination of *de facto* parentage and if the court finds by clear and convincing evidence that the following circumstances exist:

> (I) **each parent of the minor child consented to, supported, and fostered the establishment of a parent-like relationship between the minor child and the individual**;
>
> (II) the individual has exercised parent-like responsibility for the minor child; and
>
> (III) the individual has acted in a parent-like role for a length of time sufficient to have established a bonded and dependent relationship with the minor child that is parental in nature.

S.B. 600, 2010 Regular Session, General Assembly of Maryland, http://mgaleg.maryland.gov/2010rs/bills/sb/sb0600f.pdf (capitalization omitted) (emphasis added); H.B. 1241, 2010 Regular Session, General Assembly of Maryland, http://mgaleg.maryland.gov/2010rs/bills/hb/hb1241f.pdf (capitalization omitted) (emphasis added).  Ultimately, Senate Bill 600 received a hearing in the Senate Judicial Proceedings Committee, but no further action was taken, and House Bill 1241 received a hearing in the House Judiciary Committee, but was subsequently withdrawn following an unfavorable report.  See Fiscal and Policy Note, S.B. 402, 2015 Regular Session, General Assembly of Maryland, available at http://mgaleg.maryland.gov/2015RS/fnotes/bil_0002/ sb0402.pdf.

Five years later, in 2015, two bills—Senate Bill 402 and House Bill 577—were

introduced

> FOR the purpose of authorizing a court, on request of certain parties in certain judicial proceedings, to determine whether an individual is a de facto parent of a child; authorizing an individual who asserts that the individual is a de facto parent to initiate or intervene in certain judicial proceedings by filing a certain pleading; establishing a certain burden of proof and standard of proof; requiring that a judicial determination on de facto parent status be in writing; establishing that an individual who is judicially determined to be a de facto parent has the duties, rights, and obligations of a parent unless the court makes a certain determination; requiring that certain disputes regarding the allocation of child custody and visitation be removed on the basis of the best interest of the child; defining a certain term; and generally relating to de facto parents.

S.B. 402, 2015 Regular Session, General Assembly of Maryland, http://mgaleg.maryland.gov/2015RS/bills/sb/sb0402f.pdf; H.B. 577, 2015 Regular Session, General Assembly of Maryland, http://mgaleg.maryland.gov/2015RS/bills/hb/hb0577f.pdf. The proposed bills would have added a new section to the Family Law Article, providing, in pertinent part, that a *de facto* parent

> means an individual, including a current or former spouse of a parent of a child, who:
>
> (1) over a substantial period of time has:
>
>> (I) been treated as a parent by the child;
>>
>> (II) formed a meaningful parental relationship with the child; and
>>
>> (III) lived with the child;
>
> (2) has undertaken full and permanent responsibilities as a parent of the child; and
>
> (3) **has held the individual out as a parent of the child with the agreement of a parent of the child**, which may be expressed or implied from the

- 5 -

circumstances and conduct of the parties.

S.B. 402, 2015 Regular Session, General Assembly of Maryland, http://mgaleg.maryland.gov/2015RS/bills/sb/sb0402f.pdf (capitalization omitted) (emphasis added); H.B. 577, 2015 Regular Session, General Assembly of Maryland, http://mgaleg.maryland.gov/2015RS/bills/hb/hb0577f.pdf (capitalization omitted) (emphasis added). Notably, Senate Bill 402 and House Bill 577 altered the definition of *de facto* parent previously proposed in 2010 by setting forth different criteria, including that the individual must have lived with the child over a substantial period of time and by eliminating the requirement that both parents of a child must consent to and foster the *de facto* parent relationship. Additionally, the proposed bills altered the burden of proof necessary for a court to determine whether an individual is a *de facto* parent to a preponderance of the evidence from clear and convincing evidence as previously proposed in 2010. Ultimately, Senate Bill 402 received a hearing in the Senate Judicial Proceedings Committee, but received an unfavorable report, see S.B. 402, 2015 Regular Session, General Assembly of Maryland, Senate Judicial Proceedings Committee Voting Record, http://mgaleg.maryland.gov/2015RS/votes_comm/sb0402_jpr.pdf, and House Bill 577 received a hearing in the House Judiciary Committee, but was subsequently withdrawn following an unfavorable report, see H.B. 577, 2015 Regular Session, General Assembly of Maryland, House Judiciary Committee Voting Record, http://mgaleg.maryland.gov/2015RS/votes_comm/hb0577_jud.pdf.

The proposed bills from 2010 and 2015 demonstrate that there are a number of details that necessarily must accompany any decision to recognize *de facto* parenthood in

Maryland—from what burden of proof an individual bears to how an action for *de facto* parentship should be pled and what criteria an individual must satisfy to be declared a *de facto* parent. In my view, the majority opinion is broader than, and without the constraints of, the withdrawn bills. For example, the majority opinion includes no information on the burden of proof in a *de facto* parent case, the manner of petitioning to become a *de facto* parent, how a trial court should deliver an opinion in a *de facto* parent case, or, most importantly, a very basic limit that would protect children who already have two existing parents from the creation of a third parent in the absence of both existing parents' knowledge and consent to that *de facto* parent relationship.

To fill the obvious void left by the majority opinion, I would offer the following guidance. In every instance in which a trial court is confronted with a request for *de facto* parentship, the trial court should ascertain whether there are one or two existing biological or adoptive parents. In the case of two existing parents, the trial court should require that the second parent have notice of the *de facto* parent request and ascertain whether the second parent consents to the *de facto* parent relationship. In satisfaction of the first prong of the H.S.H.-K. test, an action for *de facto* parenthood may be initiated only by an existing parent or a would-be *de facto* parent by the filing of a verified complaint attesting to the consent of the establishment of *de facto* parent status. The trial court should find by clear and convincing evidence that the parent has established:

> (1)     that the biological or adoptive parent consented to, and  fostered, the petitioner's formation and establishment of a parent-like relationship with the child, and in the event of two existing biological or adoptive

parents, that both parents consented to the establishment of a *de facto* parentship;[1]

(2)     that the petitioner and the child lived together in the same household;

(3)     that the petitioner assumed obligations of parenthood by taking significant responsibility for the child's care, education and development, including contributing towards the child's support, without expectation of financial compensation; and

(4)     that the petitioner has been in a parental role for a length of time sufficient to have established with the child a bonded, dependent relationship parental in nature.

See H.S.H.-K., 533 N.W.2d at 435-36.  The trial court should be required to issue a written opinion explaining the reasons for granting or denying the request.

To be sure, the majority opinion is appropriate for the parties in this case and provides Petitioner deserved relief, but, in simply adopting the four-factor test from H.S.H.-K., with no additional safeguards or limitations, the Majority has drafted an opinion that fails to provide important safeguards as to how *de facto* parentships are to be created and fails to serve all litigants, including those similarly situated to the parties in this case as well as others who do not live in a classic nuclear family.  In addition to lacking important procedural safeguards, the majority opinion does citizens, and particularly the children, of Maryland a disservice by not including additional protections to ensure that children and

---

[1]Under the circumstance where a second existing parent may not be able to be located, the trial court should utilize the same procedure as used in the stand-by guardianship statute and require that the existing parent or would-be *de facto* parent could proceed with seeking a declaration of *de facto* parentship only after satisfactory documentation is produced to the trial court demonstrating that "reasonable efforts have been made to locate" the second existing parent.  Est. & Trusts § 13-903(a).

families are not overburdened by the custody and visitation demands of multiple parents, and by not including the limitation that, in circumstances where there are two existing parents, both parents need to have notice of, and the opportunity to consent to, the *de facto* parentship of a third party.[2]

For the above reasons, respectfully, I concur.

Judge Battaglia has authorized me to state that she joins in this opinion.

---

[2]Where there is a lack of consent on the part of the second existing parent to the creation of a *de facto* parentship, the parent who wants to foster the *de facto* parentship or the would-be *de facto* parent is not precluded from facilitating that party's access to the child by establishing exceptional circumstances for the trial court's consideration of the best interests of the child. See, e.g., Koshko v. Haining, 398 Md. 404, 444-45, 921 A.2d 171, 195 (2007) ("[T]here must be a finding of either parental unfitness or exceptional circumstances demonstrating the current or future detriment to the child, absent visitation from his or her grandparents, as a prerequisite to application of the best interests analysis.").